## BRYANT v. STATE.

CRIMINAL LAW—ASSAULT WITH INTENT TO KILL—INSTRUCTIONS—VERDICT.

1. Evidence reviewed and held sufficient to constitute the offense of assault with intent to commit murder.

2. The discharge of a pistol in the hands of the accused is not necessary to the commission of the crime of an assault with intent to commit murder.

3. The intent to kill is an important and necessary element in the offense of assault with intent to commit murder.

4. A shooting done with criminal negligence does not raise a presumption of law that there was an intent to kill.

5. An instruction to the effect that if the shooting was done with criminal negligence, the jury should find the defendant guilty of felonious assault as charged in the information is erroneous in the trial of one accused of an assault with an intent to commit murder.

6. The information charging an assault with intent to commit murder, a verdict finding defendant guilty "of a felonious assault as charged in the information" is sufficient.

[Information filed in District Court September 15, 1893. Decided June 10, 1895.]

ERROR to District Court for Fremont County, HON. JESSE KNIGHT, Judge.

Frank Bryant, the plaintiff in error, was charged upon information filed by the prosecuting attorney of Fremont County, with having feloniously, wilfully, deliberately, and with premeditated malice aforethought, with a certain loaded pistol, made an assault upon one Chester D. Chrisman, with intent to murder him, on the 5th day of July, 1893. On November 15, 1893, the defendant was arraigned and entered a plea of "not guilty." His trial occurred at the June term, 1894, of the district court for Fremont County. In addition to the testimony recited in the opinion, the following will sufficiently explain the occurrences connected with the alleged assault. An eye witness testified about the occurrence as follows: "Between one and two o'clock I was waltzing. I think it was the first waltz after supper. The music stopped, I turned facing the music stand, and just at that time I saw Bryant pull a pistol out of his pocket. Chrisman jumped towards him and struck him about the same instant. I started towards them and he struck him again. He staggered off; Chrisman struck him again and grabbed the pistol at the same time, swung around and fell on the floor facing me. As they swung around I reached and grabbed the pistol, and at the same time I put my hand on Chrisman's shoulder. The pistol was discharged; I knocked them both over on the floor; there-

was a struggle took place then, and finally I got the pistol away and had it in my own hands; Chrisman grabbed it; I struggled for it, and Louge grabbed the pistol. I said, 'Chet, let go of the pistol.' He looked up and let go the pistol. I took Bryant off in the dressing room; there was some loud talk in there, and we took Bryant out and turned him over to Brower." The same witness also testified that, afterwards, the same evening, Bryant said to him that "he intended to shoot Chrisman, and thought he had the pistol right in his breast when he pulled it off." Bryant's explanation was in the nature of self-defense and that the gun was fired accidentally. The verdict of the jury, and a certain instruction requested and refused, and one given, all of which were excepted to, appear in the opinion. When the verdict was received, the jury were polled, and each juror answered that it was his verdict, whereupon, at the request of attorneys for defendant, the court informed the jury that the verdict, as presented, was a verdict of guilty of a felony, and asked "if any member of the jury had considered it otherwise, or at this time under the explanation as made, objected to said verdict," and none of the jurors objected thereto. Objection was made to the recording of the verdict, by defendant's counsel, which was overruled, and an exception was preserved. The defendant was sentenced to a term of three years in the penitentiary.

*Melville C. Brown,* for plaintiff in error.

The verdict will not support the judgment for imprisonment in the penitentiary. It is either so uncertain as to be wholly void, or treating portions of it as surplusage, it can support a judgment for simple assault only. The term "felonious assault" describes no particular offense known to the law. If a verdict does not find the issues presented by the record, but some other, or is silent on some element of the offense, no valid judgment can be recorded upon it. (1 Bish. Cr. Pro., sec. 1015; Wharton Pl. & Pr., sec. 756; David v. State, 4 Ala., 69; State v. Bishop, 73 N. C., 44; State v. Stanley, 42 La. Ann., 978; Westbrook v. State, 52 Miss., 777; Stevens v. State, 56 Ga., 604; Riflemaker v. State, 25 O. St.,

395; Allen v. State, 52 Ala., 391; Gibbs v. State, 34 Tex., 134; Sheffield v. State, 1 Tex. App., 640; Lockwood v. State, id., 749; Manigault v. State, 53 Ga., 113; State v. Lowman, Riley, 67; Long v. State, 34 Tex., 566; State v. Davis, 20 La. Ann., 354; State v. Edmunds, 4 Dev., 340; Curran's case, 7 Gratt., 619; State v. Rawlins, 8 N. H., 550; Wynn v. State, Blackf., 28; State v. White, 41 Ia., 316; State v. Behee, 17 Kan., 402; Wilson v. State, 53 Ga., 205; 40 Cal., 426; Ex parte Max, 44 id.; People v. Venard, 6 id., 562; 1 Bish. Cr. Pro., sec. 481 et seq.; Com. v. Russell, 4 Gray, 36; 1 Bish. Cr. L., sec. 810.) Whether our statute covers the crime of intent to commit manslaughter may well be questioned; but if the manslaughter would arise by culpable neglect or criminal carelessness, there cannot be in that any intent to commit crime. That which reduces the crime in such a case to manslaughter is lack of intention. (1 Bish. Cr. L., secs. 736, 314, 730; Maha v. People, 10 Mich., 212; Slattery v. People, 58 N. Y., 354; Henderson v. State, 12 Tex., 525.) The mere drawing of a pistol, though loaded, is not an assault. (2 Bish. Cr. L., sec. 31; Lawson v. State, 30 Ala., 14; 3 Lawson's Crim. Def., 732.) In this class of cases the intent is specific and must be proved. It is not to be found as a presumption of law. (1 Bish. Cr. L., secs. 720-31, 335, 342-13; Wharton's Cr. Ev., sec. 734 et seq.; Wharton's Cr. L., sec. 176.) The evidence is insufficient to prove an assault. If the verdict is good only for simple assault, but bad for any higher offense, then defendant cannot be again put in jeopardy by a trial for any higher offense. (People v. Apgar, 35 Cal., 389; People v. Gilmore, 4 id., 380; People v. Backus, 5 id., 278; People v. Chang, 94 id., 380.)

*Benjamin F. Fowler,* attorney general, for defendant in error.

An assault is an intentional attempt, by violence, to do an injury to another. (2 Whart. Cr. L., sec. 1242.) There was an assault in this case (Watts v. State, 17 S. W., 1092), and the evidence discloses an intent to kill. Under the charge of assault with intent to commit murder, the accused may be convicted of an assault with intent to commit manslaughter.

(State v. White, 45 Ia., 325; State v. McGuire, 87 id., 142; State v. Postal, 83 id., 460; Words v. State, 27 Tex. App., 393; State v. Connor, 13 N. W., 327; Jarrell v. State, 58 Ind., 293; State v. Throckmorton, 53 Ind., 354; Cook v. Terr'y, 3 Wyo., 109.) The verdict is good and sufficient. (State v. West, 8 Am. Cr. R., 381; Com. v. Sanborn, 14 Gray, 393; State v. McIntre, 66 Ia., 339; Cook v. T'y, supra.) The word felonious cannot be treated as meaningless.

CONAWAY, JUSTICE.

There is a considerable number of assignments of error in this cause, only four of which we have deemed it necessary to discuss.

1. It is assigned as error that the verdict is not sustained by sufficient evidence.

The occurrences upon which the charge is founded took place in the early morning of the fifth of July, 1893, in a hall where a ball was in progress. Plaintiff in error was there with a revolver in his possession. During an altercation which occurred between him and Chrisman, he drew the revolver from his clothing, and a struggle for the possession of the revolver occurred, during which the revolver was discharged, whether intentionally by plaintiff in error, or accidentally, may not be entirely clear. Why he took a revolver to the ball-room, the only revolver seen there, is a question upon which there is some testimony.

John Carmoody testifies to a conversation plaintiff had with him in front of the hall and before the trouble occurred when the pistol was discharged. Carmoody relates this conversation as follows:

"I just got through dancing and was a little warm and stepped out on the sidewalk. Bryant was there and we passed the evening, and Frank asked me if I heard that Mrs. Lee and Mrs. Bryant were going to be put out of the hall. I told him I heard Mrs. Lee was, but I didn't think there was any-thing in it. We talked about it a few minutes. He said, 'Well, I told Rody if they put her out I would help him.' Then he started talking about his wife. He said she was his

wife and she had not treated him right, but he didn't care particularly about that if she would treat the child right. I started to move away, and then he spoke again about putting the women out. He said, 'Well, I am looking for trouble; I am fixed for it. I have one gun of my own and Fiser just gave me another.' I said, 'Trouble is a good thing to leave alone.' We talked a few words and then separated."

On cross-examination this witness says further of this conversation: "He said he had been talking to Rody about it and told him he would stay with him. He said Mrs. Bryant was his wife and he did not propose to see her put out. He said she had not treated him right, but he was dissatisfied with the way she treated the child, and went on talking that way."

The person designated as "Rody" was the escort of Mrs. Lee, and not of Mrs. Bryant. There was no attempt to exclude anyone from the ball-room, but later in the evening plaintiff in error found the "trouble" which is the occasion of this prosecution, in a different way. He appeared upon the floor of the ball-room while a waltz was going on, and remarked repeatedly, in the hearing of several of the dancers, and among others of Chester D. Chrisman and Mrs. Bryant, that he thought all of certain classes of persons, whom he characterized by very vile terms, indicating both males and females, had been ordered out of the house. None of these facts, so far as stated, are denied by plaintiff in error, who testified as a witness in his own behalf. On his cross-examination he is asked: "Did you make a remark to the effect that the whores and pimps were to be kept out of the hall?" He says he might have made this remark to Tway—don't know as he made the remark to keep them out of the hall, but out of town—that he "didn't refer to any one for certain at the time—and didn't know where Mrs. Bryant and Chrisman were at the time." His further explanation of what occurred just prior to the scuffle in which the pistol was discharged appears in the following questions and answers:

"Q. Did you make this remark to which I have referred at any time during that evening, in the ball-room, except twice when your wife and Chrisman were passing close to you

in the waltz? A. I don't remember making it. At the time I made this remark I didn't know where they were at.

Q. To what question was it you applied it—what remark you applied it—when you said to Chrisman, 'Take it as you like, Chet.'? A. When he spoke to me the first time I didn't understand what he said.

Q. Why did you say, 'Take it as you like?' A. He said, 'Did you mean it for me?'

Q. Was that the only remark up to the time that you had understood? A. It was the only remark Chrisman made to me. Q. How did you know what he was referring to when he asked if you meant him? A. That is what I told him, he could take it as he liked. I didn't know what he was referring to. That was the reason I told him he could take it as he liked."

This explanation can hardly be said to explain. It calls to mind the Hibernian's two defenses to an action for damage done by a breachy bull: First, he had no bull. Second, his bull was not breachy. As to the remark in question, plaintiff in error says: First, he don't remember making the remark; and second, at the time he made the remark, he didn't know where Chrisman and Mrs. Bryant were. This may sometimes be permissible in pleading, but it is hardly appropriate in sworn testimony.

Plaintiff in error testifies further that Chrisman had raised his hand to strike him before he reached for his revolver, and that Chrisman struck him and seized the revolver before he succeeded in getting it out. This is contradicted by Chrisman and by the witness Signor. Signor says: "I saw Bryant start to draw his gun, and as he started to draw the gun Chet hit him.

"Q. At the time was the gun out? A. Yes. He grabbed the gun and hit him at the same time." And in answer to a question on cross-examination, Signor says: "The pistol was out of Bryant's clothing when Chrisman grabbed it."

Gustin testifies that plaintiff in error found fault with him for interfering in the fight, and that on Gustin's replying that any American citizen had a right to interfere when a man's

life was in danger, plaintiff in error replied that he did not intend to shoot anyone except Chrisman. This is corroborated by the positive testimony of Dougherty to the same effect. There is an attempt to show by Brower that plaintiff in error did not make such a statement at the time and place fixed by Gustin and Dougherty; but Brower came in after they had been talking several minutes, and did not hear what was said before he came in. It is true Dougherty testified that plaintiff in error made the statement that he intended to kill him, not naming the person, but in a conversation in which Chrisman's name was mentioned repeatedly, and referring only to Chrisman, after Brower came in. Brower says he did not hear the statement, and certainly would have heard it if it had been made while he was there. Brower's opinion that he would be certain to hear anything said in a room in which there were a number of men doing more or less talking, is not sufficient to offset Dougherty's positive testimony, or to justify an imputation of perjury on Dougherty's part.

We are of opinion that the evidence is sufficient to sustain a conviction.

Another assignment of error is based upon the refusal of the court to give the following instruction:

"Before the jury can find the defendant guilty of felonious assault as charged in the information, they must find, beyond all reasonable doubt, that the defendant not only discharged the pistol or firearm referred to by witnesses, but that he did it with felonious intent to kill the man Chrisman with whom he was having an altercation. And if the prosecution has failed to satisfy the jury beyond all reasonable doubt upon that point, then you will find the defendant not guilty."

This instruction was properly refused. If the plaintiff in error intended to kill Chrisman or any other human being, not in self defense, under the circumstances disclosed by the evidence, his offense was complete before the pistol was discharged. The discharge of the pistol was not necessary to the commission of the felonious assault. If the intent of plaintiff in error was to unlawfully kill any human being, the drawing

of the revolver or the attempt to draw it with such intent was sufficient.

Another assignment of error is based upon the following instruction given by the court:

"The jury are instructed that the natural and probable consequences of every act deliberately done by a person of sound mind are presumed to be intended by the author of such act, and if the jury believe from the evidence in the case beyond a reasonable doubt that the defendant, Frank Bryant, did shoot at, toward, or against the said Chester D. Chrisman as charged in the information, and that the natural and ordinary consequences of such shooting would be the death of the said Chester D. Chrisman, then the presumption of law is that the said Bryant did shoot at, toward, or against Chester D. Chrisman with intent to kill him; and if the shooting was done purposely and with premeditated malice or cruelty, or with criminal negligence, the jury should find the defendant guilty of felonious assault as charged in the information."

It seems that if the discharge of the pistol was the result of negligence, although the negligence were criminal, it was not discharged purposely or intentionally, and that no intent, criminal or otherwise, can be coupled with or inferred from mere negligence. If the pistol was discharged "with criminal negligence," and death had resulted, it is evident that the crime of plaintiff in error could have been no greater than involuntary manslaughter, in which there is no element of intent to kill. The instruction, in so far as it charges that an intent to kill is a presumption of law arising from a shooting done with criminal negligence does not, in our opinion, state the law correctly. The intent to kill is an important and necessary element in the offense of which plaintiff in error was convicted. We cannot say that the jury would have found plaintiff in error guilty of a felonious assault if they had not been instructed that criminal negligence in the discharge of the revolver would authorize such finding.

The jury found plaintiff in error guilty of a felonious assault as charged in the information. It is claimed that this verdict is insufficient to sustain the judgment and sentence.

The argument is that this language does not sufficiently indicate any felony known to our law, and can be effective at most only as a conviction of a simple assault. It is true the words "felonious assault" are not used in any of our statutes as a definition of any crime. But a felonious assault is charged in the information, to wit: an assault with intent to commit murder. Plaintiff in error is found guilty of a felonious assault, as charged in the information. We are of the opinion that this is sufficient. Verdicts are not required to be of any particular form, or to use technical language. The meaning of this verdict is not doubtful. See Cook v. The Territory, 3 Wyo., 110.

For error in the instruction in regard to criminal negligence the judgment is vacated and set aside and the cause is remanded for a new trial.                    *Reversed.*

GROESBECK, C. J., and POTTER, J., concur.